UNITED STATES DISTRICT COURT
<u>SOUTHERN DISTRICT OF NEW YORK</u>

OLMEDO HIDALGO,                                        2006 Civ. No 13118 (LBS)

        Plaintiff                                      FIRST AMENDED
                                                       COMPLAINT

      -against-                                         (JURY TRIAL DEMANDED)

THE CITY OF NEW YORK, POLICE DEPARTMENT
OF THE CITY OF NEW YORK, DISTRICT ATTORNEY
ROBERT M. MORGENTHAU, INDIVIDUALLY AND IN
HIS OFFICIAL CAPACITY, STEPHEN SARACCO, JAMES KINDLER,
NANCY RYAN,WARREN MURRAY, DANIEL BIBB,
MAUREEN DUFFY KELLY, BOBBY SURO, PATRICK McKENNA
AND VARIOUS JOHN/JANE DOES,
INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AS
EMPLOYEES OF THE CITY OF NEW YORK WHO ARE / WERE
ASSISTANT DISTRICT ATTORNEYS AND/OR EMPLOYEES
OF THE OFFICE OF THE DISTRICT ATTORNEY,
COUNTY OF NEW YORK; VICTORIA GARCIA,
SGT. FNU REVES AND VARIOUS JOHN/JANE
DOES, INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES
AS EMPLOYEES OF THE CITY OF NEW YORK WHO ARE/
WERE MEMBERS OF THE POLICE DEPARTMENT OF THE
CITY OF NEW YORK,

          Defendants

_____

    Plaintiff OLMEDO HIDALGO, on knowledge as to himself and matters in which he was

directly involved and otherwise on information and belief, alleges as follows.

## PARTIES, JURISDICTION AND VENUE

    1.  Plaintiff is a citizen of the Dominican Republic who at all times relevant to this action

resided within the Southern District of New York.

    2.  Defendant The City of New York (hereinafter referred to as "The City") is a municipal

1

corporation of the State of New York situated in the Southern District of New York.

3.  At all times referred to herein, Robert M. Morgenthau was the elected District Attorney of New York County (hereafter referred to personally and officially as the office as DANY) and Stephen Saracco, Esq.  (hereafter referred to as "A.D.A. Saracco"),  James Kindler, Nancy Ryan, Warren Murray and Daniel Bibb, were/are Assistant District Attorneys and Maureen Duffy Kelly, Bobby Suro and Patrick McKenna were/are members and employees of the City of New York in the Office of the District Attorney, County of New York.

4.  At all times referred to herein Victoria Garcia, (hereafter referred to as "Det. Garcia"), and Sgt. Fnu Reves were employees of the City of New York who were detectives with the New York City Police Department.

5.  At all times mentioned herein, the City, by its agents, servants, and employees was responsible for the operation, maintenance, and control of the New York County District Attorney's Office and the selection, training, supervision, evaluation and disciplining of Assistant District Attorneys, and other employees.

6.  At all times mentioned herein, the District Attorney for New York County was the responsible policy maker for the City with respect to the management of the New York County District Attorney's Office.

7.  At all times mentioned herein, D.A. Morgenthau ,  A.D.A's. Saracco, Kindler, Ryan, Murray, Bibb, staff members Kelly, Suro and McKenna acted on behalf of the City as  municipal policymakers with final authority to decide the extent, if any, of disclosure of exculpatory information and records during the prosecution of  individuals suspected and/or accused of crimes; to determine the evidence and testimony presented at grand jury proceedings, hearings and at trial;

to provide and receive proper training and direction upon their duty to insure that criminal investigations are conducted diligently and properly; that evidence is not withheld or falsified; that witnesses in criminal prosecutions do not commit perjury or give inaccurate testimony; that they act ethically and within the law; to only make arguments to juries and courts that have a basis in fact; to conduct proper and thorough investigations prior to indictment; not to obtain indictments in bad faith; to act in accordance with the Constitution of the United States and the Constitution and laws of the State of New York; and in general, to insure that innocent people are not convicted of crimes, in accordance with their obligations as quasi-judicial officers. References to DANY in this Complaint variously refer to the office itself and the individually named defendants.

8. At all times mentioned herein, the City of New York and the Police Department of the City of New York, through its employees, including Det. Victoria Garcia and Sgt. Fnu Reves, were responsible for the investigation of crimes, apprehension of suspects, providing information for prosecution to DANY and other prosecutorial authorities, and other functions, including giving truthful evidence and revealing exculpatory evidence, to refrain from withholding or falsifying evidence, to make further inquiry when reasonable and not deviate from accepted practices, all in accordance with their obligations to conform their conduct to the Constitution of the United States and the Constitution and rules of the State of New York, and to insure that innocent people are not arrested, prosecuted nor convicted of crimes. References to NYPD in this Complaint variously refer to the department itself and the individually named defendants.

9. This action arises under 42 U.S.C. §1983 and under the common law and Constitution of New York State.

10. Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343 and by principles of supplemental jurisdiction pursuant to 28 U.S.C. §1367.

11.  Venue is proper in this Court pursuant to 28 U.S.C. §1391.

## NOTICE OF CLAIM

12.  Written Notices of Claim were filed with the City of New York on October 12, 2005. More than thirty days have elapsed since the filing of said Notices of Claim and these matters have not been settled nor otherwise disposed of.

## JURY DEMAND

13.  Plaintiff demands trial by jury of all issues raised in this Complaint.

## INTRODUCTION TO LAWSUIT AND PROCEDURAL
## BACKGROUND OF CRIMINAL PROSECUTION

14.  For about fourteen years, OLMEDO HIDALGO (along with David Lemus) served time in prison for a crime he did not commit.

15.  This crime, a murder that occurred at the Palladium NightClub on November 23, 1990 was actually committed by Joseph Pillot and Thomas "Spanky" Morales.

16.  From the date of his arrest on November 9, 1991, Mr. Hidalgo protested his innocence.

17.  Mr. Hidalgo was not at the Palladium on the night of the murder and has absolutely no connection to the event nor any of the other participants or witnesses.

18.  The case against Mr. Hidalgo was based solely on (false) eyewitness testimony.

19.   There was no physical nor forensic evidence connecting him to the murder; no admissions nor confessions; no motive; no association with any other suspects.

20.  The deceased, Marcus Peterson, and an injured man Jeffrey Craig, were "bouncers" at the Palladium.  A confrontation began between them and several men who tried to enter the club but were denied admission.

21.  These men were members of a gang originally called the "Calderon Crew" and, later,

4

just "C&C."

22.  Mr. Hidalgo was never a member nor an associate of the gang, nor was there ever any allegation or proof of his membership or association in the gang.

23.  Nevertheless, Mr. Hidalgo (and Mr. Lemus) were found guilty of murder and sentenced to 25 years-to-life in prison.  Mr. Hidalgo and Mr. Lemus were totally unknown to each other.  Mr. Hidalgo only spoke Spanish and Mr. Lemus, only English.

24.  About three years after sentence, an Assistant United States Attorney for the Southern District of New York who was investigating and prosecuting crimes involving gang members interviewed Joseph Pillot.  Pillot had agreed to cooperate with the Federal Government and, in doing so, admit his own crimes while implicating others in criminal behavior.

25.  In the course of one of these interviews - or "proffer" sessions - Pillot stated that the two men serving time for the Palladium killing were innocent; and that he, along with Thomas "Spanky" Morales, committed the murder, and that he did not know Mr. Hidalgo nor Mr. Lemus.

26.  This information was turned over to the District Attorney of New York County. (DANY). In consequence, a motion pursuant to CPL §440.10 was filed to vacate the conviction and a testimonial hearing was conducted.

27.  Despite this newly-discovered evidence, and despite the fact - unknown to the defense at that time - that DANY had information within days of the murder and way before  Mr. Hidalgo's arrest that Pillot and Morales ("Spanky" and "Joey") had been named as the actual killers, DANY fought to sustain the conviction.

28.  DANY did not reveal this during this (first) CPL§ 440 proceeding.

29.  DANY maintained that there was no support for Pillot's <u>confession</u> that <u>he</u> had committed the murder despite unrevealed evidence in its possession to the contrary; and despite the

Federal Government's reliance on the reliability of Joseph Pillot.

30. As a result of DANY's aggressive, albeit duplicitous arguments, the judge presiding at this first CPL § 440 proceeding denied Mr. Hidalgo's motion to vacate his conviction and he was returned to prison to continue his unwarranted life sentence.

31. The results of continued investigation by a new defense team during subsequent years culminated in the filing of a second CPL §440 motion in 2004.

32. Some of these results include the statements of two bouncers who were witnesses to the events. Each one corroborated Pillot's account of the shooting - the account that exonerates Mr. Hidalgo. This "new" evidence , however, had been available to be uncovered by the Defendants DANY and NYPD right after the murder and for all the years that followed, yet they chose not to contact these known witnesses. This evidence included identification of "Spanky" Morales as a shooter.

33. Importantly, there was also an array of material exculpatory information known to DANY and NYPD which was not conveyed to the defense before trial. Incontrovertibly, the prosecution failed to tell the defense before trial that: (1) a tip to a police hotline within days of the murder identified as the Palladium shooters "Spanky" and"Joey" at the address of C&C headquarters and noted that the shooting was in retaliation for being punched by a bouncer; (2) the tip also identified the car the shooters drove, a description that fit the car known by NYPD from a separate incident only several months later to be driven by Morales; (3) Det. Garcia, in charge of the case, knew that Morales had confessed to the murder, information that emanated from at least three sources–at least one of whom described Morales playing the role the People asserted Lemus played – and relayed the information from at least two of these witnesses to the District Attorney's office; (4) Det. Garcia knew that four of the bouncers at the Palladium had identified Morales as one of the culprits before trial, and that two of those bouncers described Morales's role in a way that conflicted with the

People's theory of the case; which information she also conveyed to the District Attorney's office.

34.  In this case, the pre-trial investigation fell so far below the standard of bare competence that the Plaintiff was denied a fair trial: the Defendants' files are bereft of any official police document noting the breaks in the case relating to the role of Morales as a shooter, his connection to C&C, or the role of C&C in the shooting.  Indeed, Det. Garcia admitted under oath her practice of not documenting information that might potentially assist the defense. This resulted in an arrest and indictment of Plaintiff without probable cause since it was based on identifications which NYPD and DANY had every reason to believe were faulty due to the wealth of conflicting evidence and the concomitant failure to develop it.

35.  DANY, through ADA Saracco and others, upon whom the burden falls to recognize and produce exculpatory "Brady" material, also failed completely to document in any official way either the receipt from the police department or the production to the defense of any of this material. Consequently, what remained were undecipherable notes scribbled on the back of telephone message slips that related to  important twists and turns of the investigation that affected the fairness of and, ultimately, the result of the trial.

36.  Much of this new information - including the background of the investigation by the police and the DANY - and the concomitant violation of rights by these two offices - came to light during the testimonial hearing which was held pursuant to the second CPL §440 motion .

37.  This hearing was held in the Spring of 2005 before the Hon. Roger Hayes.

38.  Ironically, the commencement of this second hearing coincided with the indictment, arrest and arraignment of Thomas "Spanky" Morales.

39.  Fifteen years after the murder, DANY finally obtained an indictment of Morales.  This indictment was largely based upon the very same evidence DANY had in its possession within the days and weeks after the murder occurred, and the unobtained  evidence of  known witnesses NYPD

and DANY deliberately chose not to interview soon after the murder and for virtually all of the fifteen years that passed during which time Mr. Hidalgo remained in prison.

40.   Indeed, ADA Daniel Bibb told the judge at Morales's arraignment that the evidence of Morales's guilt began to develop with information known by NYPD and DANY just days after the murder.

41.   However, at the same time that Mr. Bibb was arguing that Morales was the actual culprit and should be held in custody without bail, he was also fighting the §440 motion to preserve the conviction of Mr. Hidalgo - a completely inconsistent position.

42.   Yet, finally, after extensive briefing by the parties, DANY conceded that the new information uncovered by the defense, which should have been uncovered and/or revealed by DANY, coupled with all the other previously known circumstances of an exculpatory nature, warranted vacating the conviction of Mr. Hidalgo and dismissal of the indictment.

43.   Consequently, on August 19, 2005, Justice Hayes, now with DANY'S consent,  granted Mr. Hidalgo's motion to vacate and dismissed the indictment.

44.   As indicated, after this second CPL §440 hearing was concluded, a post-hearing Memorandum  of Law was submitted on behalf of both Mr. Hidalgo and Mr. Lemus.  To the extent that this memorandum provides  factual background  for this lawsuit and specifically with respect to Olmedo Hidalgo, its relevant portions will be excerpted extensively below.  Complete references to the records and transcripts generated in the criminal proceeding are available in full in the court and plaintiff's file.

45.   After the dismissal of Mr. Hidalgo's indictment on August 19, 2005, pursuant to DANY'S consent, Justice Hayes, on October 19, 2005, over the continuing objection of DANY, then granted Mr. Lemus's CPL § 440.10 motion, vacating his conviction.

46.  In an extensive 51 page written opinion, Justice Hayes made findings concerning the failures and mistakes of DANY and the Police Department concerning the investigation and prosecution of both Mr. Hidalgo and Mr. Lemus.

47. These findings confirm that DANY and the Police Department violated the constitutional rights of Mr. Hidalgo. Significant portions of this opinion will be excerpted below.  The entire opinion is attached as Exhibit A herewith and is made a part of this complaint.

48.  Ironically, over one year later, Justice Bonnie Wittner dismissed the long-delayed indictment against Thomas "Spanky" Morales on constitutional speedy trial grounds. Justice Wittner found, inter alia, that because DANY did not charge Morales with the murder soon after it occurred despite evidence of his guilt available to DANY at the time, dismissal was the only appropriate remedy.  In short, Justice Wittner wrote that  DANY's conduct was "inexcusable." Justice Wittner's opinion is attached as Exhibit B herewith and is made a part of this complaint.

## INVESTIGATIVE AND PROCEDURAL HISTORY

### Pre-Trial Investigation

49.  On November 23, 1990 at approximately 1:30 a.m. there was a shooting in front of the Palladium, located at 126 East Fourteenth Street in Manhattan, that left one bouncer, Marcus Peterson, dead and another, Jeffery Craig, wounded.  The People asserted at the later conducted trial that Lemus and Mr. Hidalgo were the gunmen and that they acted together with a man in red whose name did not appear in any court record until 1996.

50.  On November 28, 1990, only five days after the shooting, the NYPD Crimestoppers Unit received an anonymous tip that "Spanky" and "Joey" from an address known to be the headquarters of a well-known Bronx gang called C&C, were overheard claiming to have shot the bouncers at the Palladium.

51. On November 29, 1990, the case detective, Victoria Garcia, (mistakenly) concluded that "Spanky" was Jose Figueroa, a/k/a "Frankie", by checking a police database of nicknames. She did not otherwise pursue the "Spanky/Joey" lead in the Crimestoppers tip placing them at C&C headquarters.

52. Detective Garcia then retrieved a police photo of Figueroa and, after placing it in an array, showed the array to five witnesses, Ernesto Morales, Fritz Vincent, Julie Brunner, Robert Blake and Jeffrey Craig, all of whom either identified Figueroa as a mediator that night or as a look-alike but not as a shooter. As was later revealed, however, Figueroa was in custody on November 23, 1990, and could not have been the "Spanky" referred to in the tip.

53. On December 5, 1990 Detective Garcia received information that David Lemus was one of the shooters.

54. On December 5, 1990 Detective Garcia showed an array containing Lemus's photograph to four bouncers: Jeffrey Craig, John Fowler, Philip Lespinasse and Julie Brunner. Fowler and Lespinasse identified Lemus as the person who had been thrown out of the club and fought with Craig. Craig said Lemus could be the man he had the fight with. Brunner also was not positive but believed it might be Lemus or another man whose photo was in the array.

55. On January 16, 1991, the same four bouncers, as well as two other bouncers , Efren Cortes and Fritz Vincent viewed Lemus in a line-up. Craig, Fowler and Lespinasse identified Lemus. Vincent thought Lemus or another man might be the person he ejected from the club. Brunner and Cortes failed to make an identification.

56. A grand jury indicted Lemus on January 28, 1991, on second degree murder charges.

57. On December 27, 1990, Detective Garcia's partner received a tip from a detective in the 34th Precinct in upper Manhattan. According to a confidential informant, Olmedo Hidalgo was

involved in the Palladium shooting.  No further details were given.  The identity of the informant or the source of his information is not known to this day.

58.   On January 16, 1991, Fowler and Lespinasse photographically identified Mr. Hidalgo as one of the shooters.  Craig failed to identify Mr. Hidalgo.  Cortes identified Mr. Hidalgo as the "guy in red."

59.   On November 9, 1991, almost ten months later, the police arrested Olmedo Hidalgo and placed him in a line-up.  The same four bouncers viewed the line up and this time each identified Mr. Hidalgo, and Cortes's identification now matched that of the other bouncers.

60.   On November 21, 1991, a grand jury indicted Mr. Hidalgo on second degree murder charges.  It seems clear that the grand jury was not presented with the conflicting evidence that Pillot and Morales were the culprits, not Olmedo Hidalgo.

61.   Indeed, between the indictment of Lemus and Mr. Hidalgo, the police interviewed witnesses who identified Thomas "Spanky" Morales as one of the shooters and told the police about admissions he had made.  The police showed a photo array containing Morales's photo to Craig, Cortes, Fowler and Lespinasse, each of whom identified Morales.  Lespinasse and Cortes described Morales's role in a way that was inconsistent with the People's theory at the grand jury hearing and, later, trial.  No  DD-5 or official report of any kind documents any piece of the investigation and identification of Thomas 'Spanky" Morales.  Nor was there any documentation suggesting or detailing the now conceded link between C&C and the shootings.  Despite these identifications by photo array, there was no attempt to take Morales into custody and place him into a lineup.

**B.  Wade Hearing**

62.   In June, 1992, a Wade hearing was held at which Detective Garcia testified to the identifications of Lemus and Mr. Hidalgo.  On cross-examination, Detective Garcia stated that <u>only</u>

one other identification –without identifying who – had been made and that the identification was of a "witness /suspect ."  She was not required to disclose the name of the individual who was the witness/suspect.  The court barred any further inquiry, noting that if the identification implicated the People's obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), then "one has to rely upon the probity of the District Attorney's Office to respond properly..."

63.  Consistent with Detective Garcia's testimony, the People provided the defense with Rosario material prior to the hearing detailing the identification of three men: Lemus, Mr. Hidalgo and Frankie Figueroa, the wrong "Spanky."

64.  At no time prior to the proceedings involving the second CPL §440 motion, did DANY reveal that any of the trial witnesses had identified Thomas "Spanky" Morales as playing the role ascribed at trial to Lemus.

**C. The Trial**

65.   Trial began on November 12, 1992 and ended on December 2, 1992, with the convictions of both Lemus and Mr. Hidalgo on second degree murder charges.

66.  The case against Lemus hinged largely on the testimony of several eyewitnesses: Jeffrey Craig, John Fowler; Efren Cortes; Philip Lespinasse.  Additional evidence against Lemus consisted of the testimony of Dolores Spencer, a girlfriend of Lemus, who testified that Lemus had admitted to his participation in the murder shortly after the events, and an audio tape of a telephone conversation  between Spencer and Lemus in which Lemus purportedly repeated his admission. However, the case against Mr. Hidalgo relied exclusively on eyewitness testimony, which NYPD and DANY had every reason to believe was suspect.

67.  The People's theory was that the shooting was the result of a fight at the Palladium in the early morning hours of November 23, 1990.  According to the People's summation, Lemus had

a dispute with bouncer Fritz Vincent and was ejected from the club.  During the dispute, a heavyset companion of Lemus tried to mediate the dispute.  When that effort was unsuccessful, Lemus, the heavyset mediator and other members of their group left the club and walked to the nearby parking lot .

68.  According to the People's theory, it was in the parking lot that the group "hatched a plan to seek revenge" for the affront to Lemus.  The People argued that the plan was for Lemus to sneak back into the club, murder Vincent and have his friends cover his escape.  Four witnesses described Lemus as wearing dark or black clothing.  Mr. Hidalgo was in green, and a third man in red.  But when Lemus attempted to re-enter the club, he was tackled by Craig and Fowler.  At that point, Mr. Hidalgo, who was approaching the entrance to the club from the hot dog stand, along with the man in red, executed their "tactically correct plan" by opening fire on the bouncers.

69.  The People's theory was told largely through the eyes of Craig whose testimony, the ADA said, "solidifies the murderous intent" of the defendants.  Craig's account, though dramatic, diverged from the evidence others gave in ways that would prove significant in the years following the conviction.  First, the People's theory ignored the testimony of two of the witnesses who testified that it was James Callahan, not Jeffrey Craig, who struggled with Lemus, the aggrieved patron, when he tried to re-enter the club.  Second, although the People's summation focused on three shooters, the testimony at trial was less compelling and less consistent.  In particular, Lespinasse maintained that there were only two shooters; and another witness saw only one man – supposedly the man attempting to re-enter the club – with a gun.  Craig is the only witness to see the man in red shoot and the only witness to testify that Mr. Hidalgo's gun was placed to his head as it misfired.  And he alone saw Lemus put a gun to Marcus Peterson's head.

70.  Notably absent from the People's case was any reference to "Spanky and Joey" from the

Crimestoppers tip or to C&C.  Nor was there a single reference to Thomas "Spanky" Morales. Although "Spanky" made several appearances when Detective Garcia testified, according to her testimony, "Spanky" was the heavyset man who acted as a mediator during the dispute and not a gunman.

71.  Finally, no evidence was offered at trial linking Lemus and Mr. Hidalgo to each other or to any other people who had supposedly visited the Palladium as a group and acted together to carry out the shootings.

### D.    Post-Trial Proceedings

72.  In 1994, the United States Attorney's Office for the Southern District of New York commenced an investigation of the C&C gang (or the Calderon Crew) in the Bronx.  The gang made its money by selling protection to drug dealers, particularly large-scale heroin sellers, by "renting" them space to sell in the vicinity of the C&C headquarters.  A number of gang members cooperated with the federal authorities.  Among these cooperators was Joseph Pillot, who was a member of the gun toting "security force" of the gang.  In 1995, Pillot told federal law enforcement authorities that he and his "cousin" Thomas "Spanky" Morales were responsible for the murder at the Palladium and that he did not know Lemus and Hidalgo.

73.  The information provided by Pillot was turned over to the defense, and the defense filed a motion for a new trial pursuant to N.Y.C.P.L. § 440.10.  After a hearing, the court denied the motion, finding Pillot "entirely unworthy of belief." People v. Lemus, 1996 WL 639857 (N.Y. Sup. Ct. Oct. 29, 1996).  On January 16, 1997, the Appellate Division denied leave to appeal the court's decision.  People v. Lemus, 1997 N.Y. App. Div. LEXIS 839 (1st Dep't Jan. 16, 1997).

74.  On June 3, 1997, the Appellate Division affirmed the judgments of conviction.  People v. Hidalgo, 240 A.D 2d 170 (1st Dep't 1977).

75.  On October 14, 1997, the Court of Appeals denied leave to appeal.  People v. Hidalgo, 90 N.Y. .2d 1012 (1997).

76.  On October 13, 1998, Plaintiff Hidalgo and Lemus filed petitions for writs of habeas corpus in the United States District Court for the Southern District of New York.  On February 15, 2001, the petitions were denied.  Lemus v. Artuz, 131 F. Supp. 2d 532 (S.D.N.Y. 2001).

77.  On July 16, 2004, Mr. Hidalgo and Lemus filed a second motion to vacate their convictions on the basis of newly discovered evidence, pursuant to N.Y.C.P.L. § 440.10.

78.  Meanwhile, on April 15, 2005, a grand jury sitting in New York County finally indicted Thomas "Spanky" Morales for his role in the murder at the Palladium, relying at least in part on witnesses who, at the second 440.10 hearing, placed Morales in the role the People asserted at trial Lemus played.  The same evidence upon which Morales was indicted in 2005 was available to DANY in late 1990 and early 1991.  Morales, finally indicted fifteen years late,  was arraigned on April 18, 2005, the same day that hearings began on the defense's renewed 440.10 motions.

**E.  Significant new evidence derived from the hearing which impacts upon this lawsuit**

79.  Apart from a wealth of newly - discovered evidence which clearly supported the innocence of Mr. Hidalgo, the hearing proved that DANY and Det. Garcia themselves and the NYPD and DANY's office through their employees  violated his constitutional rights.

80.  In his opinion explaining his decision to grant the CPL §440.10 motion, Justice Hayes referred to many of the actions and inactions of  DANY and NYPD which lead to the conclusion that the defendants herein exhibited, at minimum, deliberate indifference to the constitutional rights of the plaintiff Olmedo Hidalgo.

81.  Although James Callahan went "face to face, - almost chest to chest" with "Spanky Morales," and had seen the outline of a revolver under Morales's shirt, and was interviewed the very

15

night of the homicide, he was not contacted by DANY or NYPD for <u>fourteen</u> years. When he was finally interviewed in July, 2004, he quickly identified Morales as a perpetrator and excluded Mr. Hidalgo (and Mr. Lemus) from involvement.

82.    A witness who did testify at the trial, Fritz Vincent, was not shown a photograph of Morales until March, 2004, twelve years after the trial, despite NYPD's and DANY's awareness that "Spanky" was a named suspect within days after the murder. After doing so, he <u>also</u> identified Morales as a participant in the homicidal altercation.

83. Danila Sanchez's ex-husband Heriberto Troche has a half-brother, Thomas "Spanky" Morales, one of the actual murderers. Within months after the shooting, Sanchez, who is now a supervisory border patrol agent with the Department of Homeland Security, told members of the NYPD that Troche had told her that Morales had shot someone at the Palladium. Noone from the NYPD nor DANY attempted to contact Sanchez or Troche prior to the arrest and indictment of Plaintiff or, indeed, prior to trial, once again despite "Spanky's" status as a suspect. Sanchez was not contacted again by NYPD or DANY until 2003, twelve years later. When she was finally re-interviewed, Sanchez, after looking at Det. Garcia's handwritten notes from 1991, confirmed that she had provided her contact information and the information about Morales's involvement in the murder to the detective early in the investigation, which information was ignored after NYPD and DANY focused on Mr. Hidalgo.

84. This detective, defendant Victoria Garcia, according to her own testimony, did not follow-up on the information she acknowledged she received from Danila Sanchez that "Spanky" Morales was one of the murderers. Yet, she had also received information from a Det. Richard Early about a "Crimestoppers" tip Early had received on November 28, 1990, only five days after the murder. In it, the caller said that two men, "Spanky" and "Joey" (Pillot) whom the caller described

16

in detail, had admitted to shooting the two bouncers. During this early stage of the investigation, and later, Det. Garcia, as the lead detective, was in communication with members of DANY, in particular, investigators Bobby Suro and Patrick McKenna. Judge Hayes determined Det. Garcia's testimony to be "inconsistent with other witnesses, logic, and documentary evidence." She acknowledged engaging in "questionable police practices." Importantly, Det. Garcia testified that she disregarded any evidence that contradicted the conclusion that Mr. Hidalgo and Mr. Lemus were present at the Palladium and did the shooting on November 23, 1990. Indeed, at the recently completed re-trial of David Lemus at which he was acquitted, Det. Garcia testified that she did not prepare follow-up investigation reports (DD-5's) when witnesses did not identify either Mr. Hidalgo or Mr. Lemus. She was instructed by her supervisor, a Sgt. Reves, not to file these reports, as required, explaining that two people were already in custody for the homicide. In fact, she testified that if Mr. Hidalgo and Mr. Lemus were not identified, that fact could later hurt the case. "We would have lost the case right there. It would have been over. I don't care what court you're in." One additional indicia of Morales's involvement that Det. Garcia ignored came from one of another detective's informants. This informant, a Hector Colon, stated, corroborating all the tips, that Morales had admitted his guilt of the murder. Det. Garcia never even attempted to speak to Colon.

85. Maureen Duffy Kelly, who was working as a trial preparation assistant from DANY, acknowledged that she had received information from NYPD about an informant who named "Spanky" Morales as a participant in the Palladium murder. Her handwritten notes from 1991 also revealed - contradicting Det. Garcia - that Morales's photograph had been selected from a photo array by at least three of the four witnesses that viewed the array (Cortes, Lespinasse and Craig ). Yet, despite this evidence, no attempt was made by DANY or NYPD to investigate Morales as a shooter and seek his indictment since it conflicted with the DANY theory that Mr. Hidalgo and Mr.

17

Lemus were the shooters.

86.   Eric Sears, Mr. Lemus's trial counsel, never received from DANY Det. Garcia's handwritten notes referring to Sanchez's and Troche's statements about Morales's admissions to the murder.   Nor had he received Maureen "Kelly's handwritten notes referring to Sanchez, the photographic array identifications of Morales by four bouncers, and information about a confidential informant from the 24th Precinct ..."and " Detective Early's November 28, 1990, DD5 from the Crimestoppers Unit." (opinion, p.26).  Such information that tended to support the innocence of Mr. Hidalgo is exculpatory and denoted "Brady" material which prosecutors are required to turn over to defense counsel.  Indeed, Justice Hayes determined that Mr. Sears had not been made aware "that four bouncers had selected Morales's  photograph from an array, and that some attributed roles to Morales inconsistent with the People's evidence and theory at trial . . ."(Opinion, p. 27)

87.   Both DANY and the Police Department, through their employees ,had conducted a so-called investigation which amounted to both an intentional aim to violate, and deliberate indifference to, the constitutional rights of Mr. Hidalgo.

88.   The violation of these rights by all defendants occurred during the investigatory stage prior to the indictment of Mr. Hidalgo and continued after his arrest, during pre-trial proceedings and through trial.

89.   The violation of rights continued as well during post-trial proceedings in which, at all turns, DANY fought against any relief for Mr. Hidalgo despite previously known exculpatory information and additional exculpatory information derived from DANY's further "investigations."

90.   It was only at the very end when Justice Hayes's decision on the second CPL 440.10 was imminent - after Mr. Hidalgo had been kept in prison even longer -  that DANY consented not only to vacating the conviction but to a dismissal.

91.   As virtually all of the evidence pointing away from Mr. Hidalgo as a participant in the

crime had been known by DANY for years - even before his indictment and arrest - the decision to dismiss the case was a concession that, at minimum, DANY had exhibited deliberate indifference to Mr. Hidalgo's rights.

92.  This conclusion has now been confirmed by the Hon. Bonnie G. Wittner, a Justice of the Supreme Court of the State of New York.

93.  After Justice Hayes granted Mr. Lemus's motion to vacate his conviction, his case, along with the recently indicted one of "Spanky Morales," was transferred to Part 61 of the Supreme Court for trial of both Mr. Lemus and Morales.  (Mr. Lemus had been released from custody; Morales was held in custody in lieu of bail after his arrest).

94.  Morales,  through counsel, brought a motion to dismiss the indictment against him on the grounds that his constitutional rights to a speedy trial had been violated.

95.  The motion reiterated and amplified the facts and arguments that supported DANY's improvident investigation and unwarranted prosecution of Mr. Hidalgo (and Mr. Lemus) and its failure to prosecute "Spanky" Morales (until "forced" to fifteen years later.) Some of these observations included the following:

(a) the "Crimestoppers" tip received within days of the murder was extraordinarily specific describing, for instance, a blue Oldsmobile with a partial plate number, the names "Spanky" and "Joey", and matching descriptions of each;

(b) the "uncanny similarity" of the information provided by Danila Sanchez Troche a full nine months before Mr. Hidalgo was indicted;

(c) the presence of "Spanky's" girlfriend Millie, at the Palladium;

(d) informant Hector Colon's information that "Spanky" carried a .9mm weapon matching the fact that a .9mm unspent bullet was recovered at the crime scene;

(e) the failure of Det. Garcia to make a serious attempt to locate Colon;

(f) the failure of ADA Saracco to regard "Spanky" as a shooter, rather than a bystander, despite his knowledge that the detailed tips, and the information from Colon and Troche all stated that he was a shooter;

(g) ADA Saracco's complete rejection of a statement made in 1992 by Bernardo Rodriguez, a "C&C" gang member to Det. Robert Addolorato to the effect that he witnessed the shooting at the Palladium and saw "Spanky" and Joey" there firing guns; a description of the events that is very similar to the one later provided by Joey Pillot himself to the federal authorities;

(h) the failure of NYPD and DANY to recognize that nothing linked Mr. Hidalgo to Lemus, yet all the available leads linked "Spanky" Morales to Joey Pillot;

(I) especially after Pillot confessed his involvement with Morales, the failure of DANY to at least put Morales in a line-up - even if he was a third culprit- as DANY often suggested - and, perhaps, still does;

(j) Pillot's testimony at the first 440 hearing was completely corroborated by what DANY knew at that time but withheld from the defense.  This testimony later became even more credible after another "C&C" member,  Richard Feliciano, was interviewed by the U.S. Attorney's Office in 2000: Richard Feliciano described what occurred in virtually the same terms as Pillot had at that first hearing; yet this corroboration of Pillot's account - which exonerated Mr. Hidalgo - was ignored and also hidden from the defense; indeed, DANY refused to even interview Feliciano despite several strong suggestions by the U.S. Attorney's Office to do so; specifically, the Assistant U.S. Attorney, Nicole LaBarbera, contacted ADA Saracco with this news in July, 2000.  Yet, at that time, and again in February , 2003, when she recommunicated with DANY, no interview by DANY was conducted even though Chief Assistant DA James Kindler and Chief of the Trial Division Nancy Ryan were also importuned by Ms. LaBarbera to speak to Feliciano.

(k) in an unrelated matter, "Spanky" had been seen running from a blue Oldsmobile on

March 5, 1991 bearing license # 3LA181, a number similar to that provided in the tip received within days of the murder;

(l) ADA Saracco knew all this additional information as, apparently, his bureau chief, Warren Murray also did; yet, all was ignored in the attempt to uphold Mr. Hidalgo's conviction;

(m)  at the first 440 hearing, ADA Saracco argued that Pillot was not credible and that, therefore, the motion should be denied, because Pillot did not corroborate the presence of the other "Spanky" (Figueroa) at the shooting.  Yet, Det. Garcia knew all along and must have told ADA Saracco that Figueroa was in jail on the night of the murder:

96.  With  all this evidence of prosecutorial indifference to the truth and DANY's and NYPD's  concomitant inaction brought out in Morales's motion to dismiss,  Justice Wittner,  on September 22, 2006, granted the motion  and Morales was freed from custody.

97.  In her 18 page opinion, Justice Wittner criticised DANY for ignoring the evidence of Morales's guilt, much of which was known as early as the days and weeks after the shooting; and concomitantly, therefore, ignoring the evidence of the innocence of Mr. Hidalgo.

98. In her decision, Justice Wittner noted that DANY's conduct was "inexcusable."(B-17).

99.  Justice Wittner found that DANY had probable cause to arrest "Spanky" Morales soon after the shooting and that "the People and police" had an "obligation to diligently investigate leads or conduct lineups and interviews" in order to prosecute Morales; an obligation which they totally ignored. (B-1)

100.  Had DANY and the police honored that obligation, Mr. Hidalgo would have been quickly discounted as a suspect by DANY as he was - by their concession - fourteen years later.

101.  The excuses offered by DANY (on their behalf and that of NYPD) in various court documents and affirmations were roundly rejected by Justice Wittner.

102.  In her opinion, Justice Wittner - per agreement by DANY and Morales's counsel -

relied on the findings of fact rendered by Justice Hayes.

103.   Therefore, Justice Wittner reiterated that NYPD and DANY had facts in their possession soon after the shooting that implicated Morales and Pillot which, thereby, was exculpatory as to Mr. Hidalgo.

104.   These included the aforementioned "tips" about the involvement of "Joey" and "Spanky" from two separate sources; the confession made by "Spanky" to Herbert Troche; the numerous photographic identifications of Morales by on the scene eyewitnesses some as early as February, 1991; and the presence of Morales's girlfriend Millie at the Palladium.

105.   Justice Wittner noted that none of this information nor leads were investigated by NYPD and DANY.

106.   The defendants did not try to locate Morales "for a follow up corporeal identification and interview" nor was an attempt made to locate Herbert Troche (until 13 years went by) through his wife Danila who had provided her telephone number and address. (B-3).

107.   No attempt was made to locate Hector Colon, another source of information about Morales's involvement; or Millie, Morales's girlfriend who as indicated, was with him the night of the shooting.

108.   "Similarly, another Palladium bouncer working on the night of the murder, James Callahan, was interviewed by the police that night and provided his address and phone number.  He did not hear from law enforcement personnel again until 2004.  He now identifies Morales as one of the participants in the crime." (B-4)

109.   "A crucial eyewitness, Fritz Vincent, who had the opportunity to observe the participants in the altercation at the Palladium, could not identify anyone at the Lemus and Hidalgo trial.  Nevertheless, he was never shown a photo array or line-up containing defendant, Thomas Morales.  He now identifies Morales as the man he fought with at the Palladium."(B-4)

110. "Det. Garcia neither issued a wanted card for Morales nor did any follow up with respect to these <u>compelling</u> leads."(B-4) (emphasis supplied)

111. Justice Wittner went on to comment on DANY's failures to come to grips with the evidence supporting Mr. Hidalgo's innocence during the several post-conviction proceedings, remarking, at one point, that their aim was only to uphold his conviction and justify their own "inexcusable" conduct.

112. DANY's desire to ignore the truth was demonstrated over and over according to Justice Wittner.

113. For instance, as she wrote,

> Soon after the sentencing of Lemus and Hidalgo, Det. Robert Addolorato of the 40th Precinct in the Bronx was assigned to a joint Federal/State Task Force. In connection with the assignment, he interviewed a number of "C&C Gang" members. He questioned Benny Rodriguez who told Addolarato that he witnessed the Palladium shooting. He said he saw Spanky and Joey, also C&C Gang members, outside the club, and saw Spanky shoot a white bouncer. In fact, the murder victim was an African-American bouncer, Marcus Petersen; the wounded man Jeffrey Craig, is Caucasian. In 1993, the People interviewed Benny Rodriguez, but found him to be incredible because the deceased was black. [Bibb Aff., para. 80], apparently discounting the obvious fact that the wounded man was white. (B-4)

114. After Joey Pillot became a federal cooperator in 1994 and admitted that he and "Spanky" Morales were the culprits (and not Mr. Hidalgo nor Lemus) - giving a detailed account of the shooting - DANY still ignored the truth, despite the fact that Pillot's account corroborated all of the other evidence of Morales's guilt in possession of NYPD and DANY within weeks of the shooting, even the "tip" that Morales drove a blue Oldsmobile.

115. However, as noted by Justice Wittner, DANY and NYPD "claim they attempted to interview Thomas Morales but dropped this pursuit when he asked for transactional immunity. Despite the additional evidence implicating Morales, no corporeal identification procedure for the witnesses who had identified him in the earlier photo array was held." (B-7)

23

116.  Instead, DANY argued after the first CPL § 440.10 motion hearing was concluded in 1995 that Mr. Pillot's testimony should not be accepted yet failed to bring forth before Judge Gold at the hearing the exculpatory evidence that supported Pillot's testimony that four witnesses had made photographic identifications of Morales as the culprit - evidence they had in their possession since early 1991.

117.  From 1996 to 2000, as Justice Wittner noted, DANY continued to defend their actions and ignore evidence inconsistent with their theory that Mr. Hidalgo was one of the shooters.

118.  In July, 2000, as Justice Wittner wrote:

> . . .another AUSA, Nicole La Barbara, contacted the Manhattan District Attorney's Office to reiterate that a cooperating witness, Richard Feliciano, confirmed that Joey Pillot and Morales were the shooters at the Palladium.  Nevertheless, the People chose not to interview Feliciano at that time.  In November 2002, this AUSA again wrote to the DA's office urging them to reconsider their inaction.  She repeated that her witness, Feliciano, saw Thomas Morales, aka Spanky, aka James Rodriguez, shoot the bouncer, that neither David Lemus nor Olmado Hidalgo had anything to do with the shootings.  She also said that she found: "Feliciano to be completely candid and credible; in our view, his information is corroborated by other evidence and other witnesses.  I urge you to reconsider your decision not to interview Feliciano." [Exh. I, Reply Aff].  She also mentioned two additional witnesses, Trunt Williams and Darryl Campbell, who could corroborate admissions made by Morales and Pillot. (B- 8-9)

119.  In addition, DANY " steadfastly ignored the mounting evidence that either the wrong men had been convicted and that Thomas Morales aka Spanky, not Lemus was the shooter with the .38 caliber weapon or, at the very least, that Morales was the man who had the initial fight with the bouncer and was involved in the shooting."   (B-9)

120.  In 2003, DANY finally conducted another investigation, but, as noted by Justice Wittner, their purpose was to defend against a potential second CPL §440 motion rather than seek to implicate Morales which would, ultimately, have to result in the exoneration of Mr. Hidalgo.

121.  However, this reinvestigation ultimately did undermine DANY's case against Mr. Hidalgo.

122.  For instance, James Callahan, the bouncer eyewitness whom the DANY knew of from day one when he was spoken to by the police, was finally interviewed by the DANY in July, 2004 and identified a photograph of Morales.

123.  "Two days later, while watching an NBC News broadcast, he said of Morales, "That's the freaking guy."  He consistently stated that neither Lemus nor Hidalgo was the man whom he punched or who pointed a gun at him." (B-9)

124.  In sum, in granting the motion to dismiss made by "Spanky" Morales,  Justice Wittner made many rulings and observations that establish  that NYPD and DANY, in particular, violated Mr. Hidalgo's constitutional rights by intentionally ignoring evidence of his innocence from the investigatory stage through all the protracted court proceedings over a 14 year period in which Mr. Hidalgo suffered in prison.

125.  For instance, Justice Wittner wrote that. . .

> the People acknowledged that the failure to pursue leads regarding Morales "cannot now be explained., but may well relate to the number of murders occurring in New York City during the time period in question." [Bibb Aff., p. 26, fn. 18].  They now, for the first time, suggest that the delay was excusable because of the case's "complexities, uncertainties, and overall high degree of challenge." [People's Memo at p. 19].  A review of the facts belies this claim.  <u>The evidence against Morales is straightforward and has always been readily available to the People</u>.  (B-14). (emphasis supplied)

126. Ignoring all the evidence DANY had that contradicted their theory that Mr. Hidalgo was involved in the shooting, and failing to investigate leads that pointed to the innocence of Mr. Hidalgo, and the guilt of "Spanky" Morales was "inexcusable" conduct on the part of DANY. (B-17)

127. Justice Wittner's decision is a judicial finding that first NYPD, then DANY completely disregarded the constitutional rights of Mr. Hidalgo by precipitously adopting a theory of the case and then refusing to recognize contradictory evidence, to investigate further when presented with

more contradictory evidence, to reveal such contradictory and exculpatory evidence to the defense and adopt a position in which their only aim was to justify their own unconstitutional actions while Mr. Hidalgo languished in prison as an innocent man.

128.  Indeed, Det. Garcia admitted as much during her testimony at the second CPL § 440 hearing.

129.  ADA Daniel Bibb of the "Cold Case" Unit was assigned to reinvestigate the case on behalf of DANY.  This unit was funded, in part, by federal grants.  ADA Bibb, who is no longer with the Office of DANY was recently interviewed by NBC News.  In a short excerpt from that interview - aired on the day Justice Wittner dismissed the indictment against "Spanky" Morales - he was asked if he believed that Mr. Hidalgo (and Mr. Lemus) were not guilty.  ADA Bibb answered yes.

130.  Yet, ADA Bibb was directed to ignore the evidence upon which he based his conclusion that Mr. Hidalgo was not guilty of the murder, and was ordered to continue to fight in court against Mr. Hidalgo's motion.  As he stated in that interview, he had a "client" to serve; in other words, DA Morgenthau.

131.  As a result, ADA Bibb had no choice but to argue conflicting versions of the crime in two separate courtrooms as a result of the policy and instructions of his "client" - DANY.

132.  The inescapable conclusion is that DANY was more interested in defending their "inexcusable" behavior than in attempting to achieve justice for Mr. Hidalgo.

133.  These decisions to ignore the original and later "mounting" evidence that Morales and Pillot were the guilty parties and not Mr. Hidalgo (nor David Lemus) were obviously made with the input of supervisory personnel of DANY (and NYPD) and, it seems clear, the District Attorney himself.

134.  The case was a "cause celebre" from the beginning and only grew into more of one as the years went by.

135.  On several occasions, it received the attention of the United States Attorney's Office - as early as 1995 - when that office provided clear-cut proof in the form of a confession corroborating the original tips and leads that Morales and Pillot were the guilty men, not Mr. Hidalgo nor Mr. Lemus.

136.  As media attention grew, DANY continued to dig in its heels until it had no choice - in light of the overwhelming factual support of Mr. Hidalgo's innocence - but to consent to vacate his conviction and dismissal of his indictment.

137.  Obviously, over the years the decisions made by DANY, especially in light of the case's high profile and media attention, were those of supervisory and high level officials in the office of DANY.

138.  Indeed, the involvement of senior associates, supervisory personnel and policy-making officials within DANY was clearly present throughout all phases of the prosecution.

139.  The District Attorney at all relevant times was and is an elected officer of New York County, one of the constituent counties of the City, and the District Attorney's Office was and is funded out of the City's budget.  Further, the District Attorney was and is designated a "local officer," rather than a "state officer", under section 2 of the New York Public Officers  Law and New York has provided by statute (New York County Law §§53, 941) that the City's constituent counties, including New York County, and hence the City itself, shall have liability for torts committed by County officers and employees such as the District Attorney and his Assistants.

140. As a direct result of all defendants' wrongful and unconstitutional conduct, Plaintiff was deprived of his rights, privileges, and immunities as secured by the Constitution and other laws of the United States and the State of New York; was wrongfully deprived of his liberty for over fourteen  years while confined to various correctional facilities where he feared being attacked; was exposed to degrading, dehumanizing, and emotionally destructive prison conditions; was wrongfully

27

deprived of his familial rights; was caused to suffer physical and psychological conscious pain and suffering, including mental anguish, great stress, anxiety, shame, indignity, humiliation, separation from friends and family, isolation from society, nightmares, nervousness, sleeplessness and depression, suffered irreparable harm to his reputation; was hindered and prevented from performing and transacting his affairs and business, resulting in loss of income (both past and anticipated future); suffered a loss of enjoyment of life; was caused to incur expenses for legal representation; will need to incur expenses to address the aforementioned physical and psychological injuries; was caused to suffer great inconvenience; lost more than fourteen years of his life; and was otherwise damaged.

## FIRST CAUSE OF ACTION -DEFENDANTS' WRONGFUL DEPRIVATION OF PLAINTIFF'S RIGHTS UNDER COLOR OF STATE LAW

141.  Plaintiff repeats, reiterates, and realleges each and every allegation contained in the complaint in paragraph "1" through "140" inclusive, with the same force and effect as if set forth at length herein.

142. Defendants Saracco, Morgenthau, Kindler, Ryan, Murray, Bibb, Kelly, Suro, McKenna, Garcia and Reves, and the various John and Jane Does are personally liable for damages because of their unwarranted, unreasonable and unconstitutional acts including but not limited to (a)  ignoring evidence of Plaintiff's innocence: (b)  failing to reveal to the defense exculpatory evidence: (c)  misrepresentation of evidence: (d)  failing to investigate and follow up on leads that indicated the guilt of others and the innocence of Plaintiff;

Intentional Actions and Deliberate Indifference of the City with respect to the Office of District Attorney of New York County.

143.  The acts of DANY, Morgenthau, A.D.A's Saracco, Kindler, Ryan, Murray, Bibb,  the other named Assistant District Attorneys and   Kelly, Suro and McKenna, the other named employees, and the various John and Jane Does were committed under their authority as DANY and

as  Assistant District Attorneys and employees vested under and by virtue of the laws of the State of New York, and were, therefore, committed under the color of the state law.

144.   The City knew of the need for additional screening, training, supervising and disciplining Assistant District Attorneys and employees in the Office of the District Attorney of New York County to: a) refrain from ignoring evidence of a criminal defendant's innocence; b) refrain from misrepresenting, withholding or falsifying evidence, c) exercise care and thoroughness in the investigation and prosecution of a case of a murder involving no other evidence but identifications; (d) accurately identify and handle exculpatory material; and (e) refrain from obtaining indictments in bad faith and without probable cause.

145.  Through intention and deliberate indifference, the City failed to adequately provide for screening, training, supervising, and disciplining of Assistant District Attorneys serving in the Office of The District Attorney for New York County with respect to misrepresenting, withholding and falsifying evidence, conducting a proper investigation, obtaining indictments in bad faith and without probable cause, and identification  handling of exculpatory material. These and other types of intentional conduct and deliberate indifference are evidenced by decisions of the courts of the State of New York - some as recent as 2006 - reporting that the Office of the District Attorney of the County of New York engaged in various acts of prosecutorial misconduct and constitutional violations including withholding exculpatory evidence from accused individuals, engaging in improper, disingenuous and factually vacant arguments, acting in a manner to obtain a conviction at all costs rather than seeking truth and justice and, generally, failing to act in a quasi-judicial capacity, including but not limited to:

People v. Colas, 619 N.Y.S.2d 702 (1994)

People v. D'Alessandro, 591 N.Y.S.2d 1001 (1992)

People v. Norton, 563 N.Y.S.2d 802 (1992)

People v. Jones, 512 N.Y.S.2d 691 (1987)

People v. Hansen, 529 N.Y.S. 2d 497 (1988)

People v. Bendell, 489 N.Y.S.2d 81 (1985)

People v. Jimenez, 477 N.Y.S.2d 902 (1984)

People v. Vann, 388 N.Y.S.2d 170 (1976)

People v. Arrocho, 379 N.Y.S.2d 366 (1976)

People v. Dowdell, 453 N.Y.S.2d 174 (1982)

People v. Ortiz, 380 N.Y.S.2d 28   (1976)

People v. Abdul-Malik, 403 N.Y.S.2d 253 (1978)

People v. Taylor, 554 N.Y.S.2d 204 (1990)

People v. Jarrells, 597 N.Y.S.2d 305 (1993)

People v. Ortiz (Pavan), NYLJ, October 19, 2006

People v. Williams (Ronald), 7 N.Y.3d 15 (May 12, 2006)

People v. Jackson, 237 A.D. 2d 179 (1997)

People v. Burton, 256 A.D. 2d 42 (1st Dept. 1998). . .

People v. Tolbert, 603 N.Y.S.2d 844, 198 A.D.2d 132 (1st Dept 1993)

People v. D'Alessandro, 591 N.Y.S.2d 1001, 184 A.D.2d 114 (1st Dept 1992)

People v. Norton, 563 N.Y.S.2d 802, 164 A.D.2d 343 (1st Dept 1990)

People v. Coates, 74 N.Y.2d 244, 544 N.Y. S. 2d 992 (1989)

People v. Wallert, 98 A.D. 2d 47 (1983)

People v. Davis, 81 N.Y. 2d 281 (1993)

People v. Ramos, 535 N.Y.S.2d 663, 141 Misc.2d 930 (1988)

People v. Hansen, 529 N.Y.S.2d 497, 141 A.D.2d 417 (1st Dept 1988)

People v. Jimenez, 477 N.Y.S.2d 170, 102 A.D.2d 439 (1st Dept 1984)

People v. Bolden, 440 N.Y.S.2d 202, 82 A.D.2d 757 (1st Dept 1981)

People v. Rivera, 426 N.Y.S.2d 785, 75 A.D.2d 544 (1st Dept 1980)

146. The District Attorney, personally and/or through his authorized delegates, at all relevant times had final, discretionary authority to promulgate and implement policies and procedures, including policies and procedures as to personnel training and supervision, with respect to his Office's performance of its duties. The District Attorney (and/or his authorized delegates) constituted a City and County "policy maker" and acted with intention and deliberate indifference to the constitutional rights of persons coming into contact with his Office in the manner set forth above.

147. Upon information and belief, prosecutors have not been disciplined by the City or in the Office of the District Attorney for New York County for their misconduct, despite repeated judicial findings that a prosecutor from that office engaged in misconduct. Such failure constitutes deliberate indifference toward the constitutional rights of the accused and such misconduct constitutes a practice, pattern and custom of engaging in prosecutorial misconduct including, but not limited to withholding exculpatory evidence from the accused that exists among the prosecutional personnel in the Office of the District Attorney.

148. By virtue of the decisions referred to above and other information and court decisions, the District Attorney knew that the need for adequate screening, training, supervising, and disciplining of Assistant District Attorneys was and is compelling because of the overriding credo of A.D.A. Saracco, and other prosecutors in the Office of the New York County District Attorney, both named and unnamed, to obtain convictions at all costs with deliberate and total disregard for the truth and for the constitutional rights of the accused.

31

149.   Specifically with respect to A.D.A. Saracco , the Office of the District Attorney, through its management and supervisory personnel, knew of the inherent risks of permitting A.D.A. Saracco to handle this homicide case.

150.   The District Attorney knew that Mr. Saracco would do anything to obtain a murder conviction in this highly public prosecution.  This circumstance required an even more heightened and controlled level of supervision which should have been exercised or, alternatively, taking all conceivable steps to insure that he would act ethically and, specifically in accordance with his duties as a quasi- judicial officer and, specifically under Brady v. Maryland and similar cases.

151.   However, rather than more scrutiny and supervision to avoid such concerns, the office actually fostered and instigated his conduct.  Supervisory personnel, and others  were apparently directly involved and became aware of but ignored the evidence and strong indications that Mr. Hidalgo was innocent.  It never occurred to them that they might be convicting an innocent man.

152.   In addition, during all the post-convictions proceedings and at the hearings, the District Attorney used every tool to prevent the disclosure of exculpatory evidence and of the improper behavior of its employees.  Upon information and belief, it did no investigation into the circumstances surrounding this improper behavior but sought only to protect the "integrity" of its office.  Indeed, when a new ADA, Daniel Bibb, was assigned and apparently expressed his misgivings about continuing to fight against the granting of the second CPL 440 motion, he was directed by supervisors and likely, DANY himself, to continue.

153.   But for the City's deliberate indifference in failing to adequately provide screening, training, supervision, and discipline of Assistant District Attorneys serving in the Office of the District Attorney for New York County and its affirmative acts, the innocent plaintiff would not have been prosecuted nor convicted for the crimes with which he was charged, nor have continued to suffer through the failure of his post-conviction motions.

154.   The aforesaid conduct operated, inter alia, to deprive plaintiff of important and well-established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and the rights established by the Constitution of the State of New York, including plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial , his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.   Such misconduct also directly and proximately caused his arrest, indictment, the conviction, the sentence and plaintiff's incarceration for over fourteen  years.

155.   By reason of the aforesaid violations of plaintiff's rights, plaintiff is entitled to damages under Section 1983, Title 42, of The United States Code.

156.   The foregoing violations of plaintiff's Constitutional rights, the conviction, the sentence, plaintiff's incarceration, and the resulting and continuing injuries to plaintiff were further directly and proximately caused by the City's deliberate indifference to the Constitutional rights of persons coming into contact with the District Attorney's Office of New York County.

157.   With respect to all of the wrongful actions and omissions alleged above, the City knew to a moral certainty that its employees would confront such situations that adequate screening, training, equipment, supervision, and discipline would have made the City's employees choices less difficult, and there is a clear history of employees mishandling such situations; and that wrong choices by the City's employees frequently result in deprivations of citizen's Constitutional rights.

158.   The foregoing violations of plaintiff's Constitutional rights comprised Constitutional torts and were effected by actions undertaken under color of law, statutes and regulations of the State of New York.

159.   The individual defendants are responsible personally and in their official capacities for

the violation of said rights.

160.  By reason of the foregoing, defendants are liable to plaintiff in an amount not less than fifty million dollars ($50,000,000.00)

## SECOND CAUSE OF ACTION - FEDERAL
## AND STATE CIVIL RIGHTS CLAIMS

161.  Plaintiff repeats and realleges Paragraphs 1 through 160.

162.  Defendants Morgenthau, Saracco, Kindler, Ryan, Murray, Bibb, Suro, McKenna, Garcia, Reves, the Police Department of the City of New York and the City of New York violated the civil rights of Plaintiff, as guaranteed by the Constitutions of the United States and The State of New York.

163.  These defendants, acting within the scope of their authority, failed to conduct a proper investigation by ignoring exculpatory evidence and failing to reveal it which would have prevented the indictment and prosecution of Plaintiff.

164.  After the unwarranted arrest and prosecution of Plaintiff,  said exculpatory evidence would have resulted in dismissal of the charges against Plaintiff .

165.  Said evidence in defendants' possession prior to arrest and indictment negated any probable cause that Plaintiff had committed the murder.

166.  Had probable cause existed at one time, said exculpatory evidence resulted in the dissipation of probable cause prior to the time Plaintiff was arrested and indicted for murder.

167.  The Plaintiff 's civil rights under 42 U.S.C. §§ 1983 and 1985 and the Constitutions of the United States and the State of New York have been violated by defendant's actions.

168.  The Plaintiff was denied his constitutional rights to be free from his seizure, arrest and imprisonment without probable cause and due process of law.

169.  The individual defendants are responsible personally and in their official capacities for

the violation of said rights.

170. As a result, Plaintiff was damaged in the sum of $50,000,000.00 (Fifty Million Dollars).

### THIRD CAUSE OF ACTION-FEDERAL CIVIL RIGHTS CLAIM

171.  Plaintiff repeats and realleges Paragraph Paragraphs 1 through 170.

172.  Defendants Garcia's and Reves's actions were part of a pattern, practice and policy of the Police Department and the City of New York to ignore and violate  the constitutional rights of the people with whom they come in contact.

173.  The acts of NYPD, Det. Garcia, Sgt. Reves and the various John and Jane Does were committed under their authority as NYPD and as police officers vested under and by virtue of the laws of the State of New York, and were, therefore, committed under the color of state law.

174.   The City knew of the need for additional screening, training, supervising and disciplining of police officers to: a) refrain from ignoring evidence of a criminal defendant's innocence; b) refrain from misrepresenting, withholding or falsifying evidence, c) exercise care and thoroughness in the investigation and prosecution of a case of a murder involving no other evidence but identifications; (d) accurately identify and handle exculpatory material; (e) refrain from obtaining indictments in bad faith and without probable cause; and (f) refrain from giving false testimony.

175.  Through intention and deliberate indifference, the City failed to adequately provide for screening, training, supervising, and disciplining of police officers with respect to the above mentioned issues.  This type of intentional conduct and deliberate indifference is evidenced by decisions of the courts of the State of New York reporting that the NYPD and its employees engaged in various acts of misconduct including but not limited to the falsification of evidence, withholding evidence of innocence, giving false testimony and, generally failing to act in a reasonable, professional and honest capacity, including but not limited to:

Riddick v. City of New York, 772  NYS 2d 294, 4 A.D.3d 242 (1st Dept 2004)

Bonefant v. Kelly, 759 NYS 2d 872, 306 A.D.2d 108 (1st Dept 2003)

Wagner v. Kerik, 748 NYS 2d 860, 298 A.D.2d 322 (1st Dept 2002)

Seligson v. Kerik, 744 NYS 2d 655, 295 A.D. 2d 262 (1st Dept 2002

Foy v. Safir, 717 NYS 2d 126, 277 A.D. 2d 169 (1st Dept 2000)

Titone v. Safir, 717 NYS 2d 55, 277 A.D. 2d 161 (1st Dept 2000)

Castro v. Safir, 717 NYS 2d 44, 277 A.D. 2d 123 (1st Dept 2000)

Mieles v. Safir, 707 NYS 2d 437, 272 A.D. 199 (1st Dept 2000)

Sannuti v. Safir, 689 NYS 2d 479, 261 A.D.2d 153 (1st Dept 1999)

Brovakos v. Bratton, 678 NYS 2d 21, 254 A.D. 2d 32 (1st Dept 1998)

Ranalli v. Safir, 672 NYS 2d 872, 250 A.D. 2d 507 (1st Dept 1998)

Vasquez v. Safir, 673 NYS 2d 12, 250 A.D. 2d 448 (1st Dept 1998)

People v. Kenrick, 162 Misc.2d 75, 162 Misc.2d 75(Crim., N.Y. County 1994)

Hickey v. Ward, 555 NYS 2d 763, 161 A.D. 495 (1st Dept 1990)

176.  Upon information and belief, police officers have not been disciplined by the City or in the NYPD for their misconduct, despite repeated judicial findings that a police officer from that office engaged in misconduct. Such failure constitutes deliberate indifference toward the constitutional rights of the accused and such misconduct constitutes a practice, pattern and custom of engaging in police misconduct including, but not limited to withholding exculpatory evidence, giving false testimony and arresting without probable cause.

177.  By virtue of the decisions referred to above and other information and court decisions, NYPD and the City knew that the need for adequate screening, training, supervising, and disciplining of its employees was and is compelling because of the overriding credo of those such as Det. Garcia and Sgt. Reves to make arrests and "clear cases" quickly and at all costs with deliberate and total disregard for the truth and for the constitutional rights of the accused.

178.  Specifically with respect to Det. Garcia, Sgt. Reves, NYPD and the City through its management and supervisory personnel, knew of the inherent risks of permitting her to handle this homicide case.

179.  NYPD and the City knew that Det. Garcia and Sgt. Reves were not only ill equipped, not up to the task, but, regardless, would do anything to make an arrest in this highly public case. This circumstance required an even more heightened and controlled level of supervision which should have been exercised or, alternatively, taking all conceivable steps to insure that she would act in accordance with accepted practice and, specifically, in accordance with her constitutional duties.

180.  However, rather than more scrutiny and supervision to avoid such concerns, NYPD and the City actually fostered and instigated her conduct.  Supervisory personnel, and others were apparently directly involved and became aware of but ignored the evidence and strong indications that Mr. Hidalgo was innocent.  It never occurred to them that they might have selected an innocent man for arrest and prosecution.

181.  In addition, during pre-trial, trial and all the post-convictions proceedings and at the hearings, Det. Garcia, in collusion with Sgt. Reves and DANY, used every tool to prevent the disclosure of exculpatory evidence and of their own improper behavior.

182.  But for the City's deliberate indifference in failing to adequately provide screening, training, supervision, and discipline of police officers and its affirmative acts, the innocent plaintiff would not have been arrested, prosecuted nor convicted for the crimes with which he was charged, nor have continued to suffer through the failure of his post-conviction motions.

183.  The aforesaid conduct operated, inter alia, to deprive plaintiff of important and well established rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and the rights established by the Constitution of the State of New York,

including plaintiff's right not be significantly detained pretrial except pursuant to ta fair and reliable determination of probable cause, his right to be free from bad-faith prosecution, his right to a fair trial, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.   Such misconduct also directly and proximately caused his arrest, indictment, the conviction, the sentence and plaintiff's incarceration for over fourteen years.

184.  By reason of the aforesaid violations of plaintiff's rights, plaintiff is entitled to damages under Section 1983, Title 42, of The United States Code.

185.   The foregoing violations of plaintiff's Constitutional rights, the conviction, the sentence, plaintiff's incarceration, and the resulting and continuing injuries to plaintiff were further directly and proximately caused by the City's deliberate indifference to the Constitutional rights of persons coming into contact with the NYPD.

186.  With respect to all of the wrongful actions and omissions alleged above, the City knew to a moral certainty that its employees would confront such situations that adequate screening, training, equipment, supervision, and discipline would have made the City's employees choices less difficult, and there is a clear history of employees mishandling such situations; and that wrong choices by the City's employees frequently result in deprivations of citizen Constitutional rights.

187.  The foregoing violations of plaintiff's Constitutional rights comprised Constitutional torts and were effected by actions undertaken under color of law, statutes and regulations of the State of New York.

188.  The individual defendants are responsible personally and in their official capacities for the violation of said rights.

189.  By their actions and inactions in this regard, defendants City and Police Department act with deliberate indifference to the rights of those with whom they come into contact.

190.  As a result of said actions and inactions by defendants City and Police Department, Plaintiff was falsely arrested, falsely imprisoned  and maliciously prosecuted for a crime which he did not commit.

191.  As a result of the violation of these rights, Plaintiff was damaged in the sum of $50,000,000.00 (Fifty Million Dollars).

## FOURTH, FIFTH AND SIXTH CAUSES OF ACTION -

## FALSE ARREST, MALICIOUS PROSECUTION AND FALSE IMPRISONMENT

192.  Plaintiff repeats and realleges Paragraphs 1 through  191.

193.  With intent and gross negligence, defendants DANY, Morgenthau, Saracco,  Kindler, Ryan, Murray, Bibb, Kelly, Suro, McKenna, Garcia, Reves, City of New York and Police Department caused the unjust and false arrest, the false imprisonment, and malicious prosecution of Plaintiff for a crime he did not commit.

194.  With intent and gross negligence, Plaintiff was deprived of his liberty without probable cause.

195.   As a result of the false arrest, false imprisonment, malicious prosecution and deprivation of liberty, Plaintiff was damaged in the sum of $50,000,000.00 (Fifty Million Dollars).

## SEVENTH CAUSE OF ACTION-NEGLIGENCE

196.  Plaintiff repeats and realleges Paragraph 1 through  195

197.  The acts and conduct of defendants DANY, Morgenthau, Saracco,  Kindler, Ryan, Murray, Bibb, Kelly, Suro, McKenna, Garcia, Reves, City of New York and Police Department were negligent and, as a result, Plaintiff was damaged in the sum of $50,000,000.00 (Fifty Million Dollars).

## EIGHTH CAUSE OF ACTION - MUNICIPAL LIABILITY

198.  Plaintiff repeats and realleges Paragraph 1 through   197.

199.  At all times relevant, New York City Police Officers and the New York City Police Department, were acting in the scope of their employment and/or as a policy maker for the City of New York.

200.  To the extent applicable, New York City is liable in respondeat superior for said defendant's actions.

201.  Defendant City of New York knew or should have known of the Police defendants' propensity to engage in illegal, wrongful, and negligent acts detailed above and/or correct such conduct.

202.  Defendant City of New York has failed to take adequate steps to discipline, train, supervise or otherwise correct the improper and illegal conduct of said defendants and/or as a matter of policy and practice, has with deliberate indifference failed to take steps to uncover and/or correct such conduct.

203.  Defendant City of New York has damaged the plaintiff by its failure to properly supervise, train, discipline, review, remove or correct the illegal and improper acts of said defendants and/or as a matter of policy and practice, has with deliberate indifference, failed to take steps to uncover and/or correct such conduct.

204.  Defendant City of New York was negligent in the operation of its police department and the District Attorney's Office of New York County.

205.  The injuries suffered by the Plaintiff were proximately caused by each and every one of the policies and practices set forth herein.

206.  The actions of the defendants; including the City of New York, resulted in the deprivation of Plaintiff's rights pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth

40

Amendments to the United States Constitution.

207.   As a result of the false arrest, malicious prosecution, unlawful imprisonment, the violation of said rights and deprivation of liberty, Plaintiff was damaged in the sum of Fifty Million ($50,000,000.00) Dollars.

<u>NINTH CAUSE OF ACTION</u>
**(MUNICIPAL LIABILITY)**

208.   Plaintiff repeats and realleges Paragraphs 1 through 207.

209.   Defendant City of New York knew or should have known of the Police defendant's propensity to engage in illegal, wrongful and negligent acts as detailed above and/or as a matter of policy and practice, has with deliberate indifference, failed to take steps to uncover and/or correct such conduct.

210.   Defendant City of New York has failed to take adequate steps to discipline, train, supervise or otherwise correct the improper and illegal conduct of said defendants as detailed above and/or as a matter of policy practice, has with deliberate indifference failed to take steps to uncover and/or correct such conduct.

211.   Defendant City of New York maintained a policy and practice of arresting and prosecuting individuals without probable cause.

212.   Defendant City of New York has damaged the plaintiff by its failure to properly supervise, train, discipline, review, remove or correct the illegal and improper acts of defendants Police Department and the individual defendants and/or as a matter of policy and practice, has with deliberate indifference, failed to takes steps to uncover and/or correct such conduct.

213.   Defendant City of New York was negligent in the operation of its police department.

214.   By its actions, the City of New York deprived the Plaintiff of his constitutional rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

215.  The injuries suffered by the Plaintiff were proximately caused by each and every one of the policies and practices set forth herein.

216.  As a result of the false arrest, malicious prosecution, false imprisonment, violation of constitutional rights and deprivation of liberty, the plaintiff was damaged in the sum of Fifty Million ($50,000,000.00) Dollars.

### TENTH CAUSE OF ACTION - INTENTIONAL INFLICTION OF MENTAL DISTRESS

217.  Plaintiff repeats, and realleges Paragraphs 1 through 216.

218.  Stephen Saracco, DANY, Morgenthau, Kindler, Ryan, Murray, Bibb, Kelly, Suro, McKenna  and other John and Jane Does owed a duty of care to act ethically and within the rules of law, and as quasi-judicial officers to ensure a fair investigation, a fair trial and proper post-conviction proceedings free from misrepresentation.

219.  A.D.A. Saracco, DANY and the other DANY defendants failed to conduct themselves in that manner by knowingly withholding and ignoring exculpatory evidence when they had an absolute duty to ensure against its use and bring it to the attention of the court and counsel if it occurred.

220.  Various DANY personnel improperly argued against vacating Mr. Hidalgo's conviction in the face of mounting evidence of his innocence by, among other ways, concealing evidence of his innocence. By doing so, they placed their credibility and status as DANY and Assistant District Attorneys before the court in a single-minded attempt to uphold a conviction at all cost without regard to the truth.

221.  Through its personnel, DANY failed to investigate further and properly when confronted with clear-cut evidence pointing toward the innocence of Mr. Hidalgo.

222.  DANY, himself, and through his personnel, did these unethical and improper acts in

a case which was fraught with ambiguity and, at minimum, substantial doubt about the guilt of Olmedo Hidalgo, thereby subjecting an innocent person to a potential mandatory sentence of life imprisonment without any regard as to his innocence and the suffering that a conviction would create; and continued to fight to uphold that conviction despite evidence in its possession-withheld from the defense-which clearly indicated Plaintiff's innocence.

223.   Each of the defendants is liable personally and in their official capacity for these aforementioned acts which damaged Plaintiff.

224.   As a result of these intentional actions in disregarding the law and responsibilities being a proximate cause of the injuries and damages herein alleged including the incarceration of an innocent man, the Plaintiff, for more than fourteen years, Plaintiff was damaged in the sum of Fifty Million Dollars ($50,000,000.00).

**ELEVENTH CAUSE OF ACTION - NEGLIGENCE**

225.   Plaintiff repeats, and realleges Paragraphs 1 through 224.

226.   To the extent that any or all of DANY's, ADA Saracco's, DANY's employee's, or any of the defendants' unethical and improper actions can be attributed to a lack of adequate care in carrying out their responsibilities, they were the proximate cause of the injuries and damages herein alleged including the incarceration of an innocent man, the Plaintiff, for more than fourteen years.

**TWELFTH CAUSE OF ACTION - MALICIOUS PROSECUTION**

227.   Plaintiff repeats, and realleges Paragraph 1 through 226.

228.   During the investigation stage and prior to any judicial proceedings, and then continuing thereafter, including after the arrest and indictment of the Plaintiff, all the defendants maliciously prosecuted the Plaintiff.

229.   The defendants ignored evidence demonstrating the innocence of the plaintiff and sought his arrest and indictment despite unreliable and conflicting evidence of his involvement in

the face of clear-cut leads and other evidence demonstrating the guilt of others.

230.  Defendants continued to maliciously prosecute plaintiff by withholding from him and the court exculpatory evidence both at the trial and throughout post-conviction proceedings.

231.  Defendants deviated from accepted practices and failed to conduct further inquiry, an unreasonable level of inaction when required to do so.

232.  Had Det. Garcia, DANY, ADA Saracco and the other defendants not ignored the strong evidence and leads pointing to Morales and Pillot as the culprits, and then followed through by interviewing witnesses prior to the case presentation to the Grand Jury, Mr. Hidalgo would not have been indicted for the murder.

233.  Indeed, as Justice Wittner found, DANY had the same probable cause to indict Morales in 1990-1991 that they used to indict him in 2005.  With only a maximum of three possible culprits, had Morales been indicted in 1991 as Justice Wittner ruled he should have, Mr. Hidalgo had to be ruled out since the other two could only have been Pillot and, in DANY's view, Mr. Lemus.  Clearly, had the evidence and leads regarding "Spanky" and "Joey" been followed and investigated, both of them would have been indicted (along with, perhaps, Lemus) this would automatically exclude Mr. Hidalgo - especially considering the conflicting and weak identification evidence against him and the lack of any connection to the others or any motive.

234.  Moreover, if probable cause of Mr. Hidalgo's guilt was viewed as existing in the early stages of investigation, it was dissipated before the arrest and indictment of Mr. Hidalgo by the existence and knowledge of contradictory evidence.

235.  By the failure of the defendants to disclose and employ this exculpatory evidence, Plaintiff was arrested and indicted without probable cause, and in bad faith.

236.  Even after indictment, the prosecution of Mr. Hidalgo was continued without probable cause.

237.  More and more evidence was brought to the attention of the defendants over the years which continued to demonstrate that there never was probable cause; but that even if defendants believed there was probable cause at one time, they knew or were deliberately indifferent to the mounting evidence that negated and dissipated probable cause.

238.  The withholding of this relevant, exculpatory and contradictory evidence; including in connection with the grand jury presentation, is evidence of bad faith; therefore a malicious prosecution.  The failure to make further inquiry and to conduct further investigation when in possession of information that others had committed the murder and not Mr. Hidalgo was unreasonable, contrary to the constitutional and legal obligations of all the defendants, and a violation of the requirement that prosecution not proceed without probable cause.

239.  At the time the prosecution of Mr. Hidalgo was initiated, the information then known to the defendants did not rise to the level of probable cause that Mr. Hidalgo was guilty of murder or any crime.

240.  Probable cause was lacking despite the several identifications of Mr. Hidalgo made early in the investigation since the weakness and inconsistent nature of these identifications was ignored despite the existence of significant facts that were known pointing to the conclusion that these identifications were false and in error.

241.  In addition, the failure of the defendants - including DANY - to make any further inquiry regarding the likelihood that these identifications were inaccurate was tantamount to proceeding to prosecute Mr. Hidalgo without probable cause and in bad faith.

242.  Likewise, the deviation of the police and DANY from accepted practices in criminal cases negates probable cause.

**WHEREFORE,** plaintiff demands JUDGEMENT against defendants as follows:

I.        For compensatory damages in the amount of forty million dollars ($40,000,000.00);

II.    For punitive damages in the amount of ten million dollars ($10,000,000.00);

III.    For reasonable attorneys' fees, together with costs and disbursements pursuant to 42

U.S.C. §1988 and the inherent powers of this Court;

IV.    For pre-judgment interest, as allowed by law;

V.    For such other and further relief as this Court may deem just and proper.

Dated:    New York, New York
            January 23, 2008

                                                    Respectfully submitted,


                                                    _____/s/_____
                                                    Irving Cohen
                                                    Attorney for Plaintiff
                                                    Olmedo Hidalgo
                                                    233 Broadway-Suite 2701
                                                     New York, New York 10279
                                                     (212) 964-2544